UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| TIM EDMONSON, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) | No. 3:23-cv-01065 |
| CAPTAIN D's, LLC, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## MEMORANDUM OPINION

Following a three day trial, the jury reached a unanimous verdict that Captain D's LLC ("Captain D's") did not prove by a preponderance of the evidence that Tim Edmonson ("Edmonson") accepted the Employee Resolution Plan and Agreement ("ERPA") (also referenced as the Employee Dispute Resolution Plan and Agreement or "EDR Agreement"), which required him to arbitrate employment claims arising from his employment. (Doc. No. 83), (redacted jury verdict). Captain D's has filed a motion for a new trial, under Federal Rule of Civil Procedure 59(a)(1)(A) which authorizes the Court to set aside a jury verdict and to grant a new trial when the jury verdict is "against the clear weight of the evidence." J.C. Wyckoff & Assocs. Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1487 (6th Cir. 1991). Captain D's motion is fully briefed and ripe for review. (Doc. Nos. 97, 98 and 99).

The Sixth Circuit has imposed a high standard to grant a motion for a new trial requiring the district court to conclude that the jury's verdict is "seriously erroneous," EEOC v. New Breed Logistics, 783 F.3d 1057, 1066 (6th Cir. 2015); see also Holmes v. City of Massillon Ohio, 78 F.3d 1041, 1046 (6th Cir. 1996), or that an "undesirable" or "pernicious" element infected the jury verdict, Holmes, 78 F.3d at 1047. When deciding a motion for a new trial, the district court "must

compare the opposing proofs [and] weigh the evidence. . . ." Barnes v. City of Cincinnati, 401 F.3d 729, 743 (6th Cir. 2005) (citing J.C. Wyckoff & Assocs., 936 F.2d at 1487). In doing so, this Court must be careful not "to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Barnes v. Owens-Corning Fiberglas Corp., 201 F.3d 815, 821 (6th Cir. 2000) (citing Duncan v. Duncan, 377 F.2d 49, 52 (6th Cir. 1967)); see also Holmes, 78 F.3d at 1047 (the trial judge should not substitute its "judgment of the facts and the credibility of the witnesses for that of the jury."). "Accordingly, [the Sixth] Circuit has held that a jury's verdict should not be overturned as being against the weight of the evidence unless that verdict was unreasonable." Holmes, 78 F.3d at 1047.

Trial Evidence

At trial, Captain D's had the burden of proof to establish by a preponderance of the evidence that Edmonson accepted the EDR Agreement. Next Generation, Inc. v. Wal-Mart, Inc., 49 S.W.3d 860, 864 (Tenn. Ct. App. 2000) (concluding that the party relying on the contract has to prove its existence by a preponderance of the evidence); see also Scipio v. Sony Music Entm't, Inc., 173 F.App'x 385, 394 (6th Cir. 2006). The parties presented seven witnesses: Edmonson and six individuals affiliated with Captain D's. These witnesses fall into two groups. Group one consists of Sean MacMillan, Vice President of Human Resources and Kristina Gansser, Vice President of Product for Fourth People Matter, LLC, who describe and explain, generally, Captain D's process to onboard new employees like Edmonson. Group two consists of individuals who dealt directly with Edmonson's onboarding, including Edmonson; Jennifer Dismukes, Director of Training; Erin Mathis, Area Director; Ronnie Newell, Jr., Director of Operations; and Madison Leigh Smith, Area Director.

The following trial evidence is relevant to the instant motion.

After Captain D's acquired SPFS, former employees of SPFS had to apply for employment with Captain D's. (Doc. No. 92, Trial Tr. Vol. I at 133:4–13), (MacMillan). According to MacMillan, the hiring process starts when an applicant uses a website to complete an employment application that includes his name, birthday, a four-digit pin, email address, username, and selected work location with an open position. (Id. at 135:4–15). When the application is completed, it is sent to the PeopleMatter system, Captain D's third-party applicant tracking system operated by Fourth PeopleMatter, LLC. (Id. at 134:3–11). The completed application is reviewed by a Captain D's manager or supervisor and a decision is made on whether to hire the applicant. (Id. at 136:21–25). If the decision is to hire the applicant, the hiring manager selects the "hire" button in the PeopleMatter system. (Id. at 137:4–9). This automatically causes a computer link to be sent to the applicant that directs the applicant to create a PeopleMatter account and to complete the onboarding process to become a Captain D's employee. (Id. at 138:16–139:10). The onboarding process requires completion of 19 different documents, one of which is the EDR Agreement that includes an arbitration provision for employment claims. (Id. at 141:3–9; 142:21–23), (MacMillan). After the applicant completes all of the onboarding documents, the hiring manager acts on two of the 19 documents: the Employer Review and Verification, I-9 form that requires two forms of identification and the Required Payment Method Validation. (Id. at 142:24–143:22).

Kristina Gansser, Vice President for Product for Fourth People Matter, LLC explained how Captain D's PeopleMatter facilitates the onboarding process. After an employee is hired, the employee receives a link to begin the onboarding process, which requires completion of multiple documents, including the EDR Agreement. (Doc. No. 90, Trial Tr. Vol. II at 36:16–37:17; 38:4–17), (Gansser). She testified that only the employee can access these documents. (Id. at 40:4–14). The PeopleMatter system creates an audit trail that tracks when certain documents are completed and prompts the Captain D's employee to take the final steps to complete the hiring process. (Id.

3

at 40:25–41:6). PeopleMatter, however, does not document when someone actually logs into the system or who is doing so. (Id. at 41:7–12; 51:7–15). Gansser explained that the PeopleMatter audit trail for Edmonson (Joint Ex. 24), shows that on July 12, 2022, Edmonson electronically signed 19 documents between 5:06 p.m. UTC time[1] to 5:17 p.m. UTC time. During that time period, at 5:16 p.m. UTC, he signed the EDR Agreement. (Id. at 43:24–45:17; 47:2–16; Joint Trial Ex. 24 at 1–5; Joint Ex. 13 at 4).

The process to employ Edmonson began when Dismukes selected the "hire" button in PeopleMatter associated with his application. (Doc. No. 92, Trial Tr. Vol. I at 164:9–13), (Dismukes). After she did so, she had no other involvement with Edmonson or his onboarding process. (Id. at 164:18–20; 179:8–13). Neither did she "recall" ever talking to Edmonson prior to August 24, 2022, when Edmonson told her he was having problems accessing PeopleMatter. (Id. at 179:14–15; 182:14–18).

Edmonson's onboarding process occurred on July 11 and 12, 2022. (Id. at 163:16–164:1). The jury was presented with two different versions of Edmonson's onboarding process. The Captain D's witnesses testified that Edmonson signed all of the 19 onboarding documents, including the EDR Agreement. Edmonson, however, testified that he did not sign any of those documents, and he presented evidence contesting certain events during his onboarding process.

Edmonson returned home to Murray, Kentucky, from his family vacation Sunday afternoon, July 10, 2022. (Doc. No. 90, Trial Tr. Vol. II at 124:8–9), (Edmonson). The next morning, Monday, July 11, 2022, he met and worked with Ronnie Newell, Jr., Captain D's Director of Operations, all morning in Murray, Kentucky. (Id. at 105:17–23). Later, they traveled to Mayfield, Kentucky, to onboard new employees. (Doc. No. 92, Trial Tr. Vol. I at 98:7–16),

---

[1] The parties' Stipulations allows for conversion of the UTC time to the Central Time Zone. (Doc. No. 59).

(Newell). Edmonson told Newell that his onboarding was complete, so Newell told Erin Nicole Mathis, Area Director, to complete Edmonson's I-9 verification. (Id. at 103:9–104:13). However, she told Newell that she could not do so because Edmonson's onboarding was incomplete. (Id.). Newell then told Edmonson to complete the onboarding process. (Id.). Newell saw Edmonson sitting on a bench and believed that he was completing his onboarding with his cell phone. (Id. at 106:14–25). However, Newell did not actually see Edmonson complete his onboarding documents. (Id. at 112:23–113:8)

On July 12, 2022, Newell testified that he met Edmonson in Paducah, Kentucky, to visit the Paducah Captain D's restaurant and employees because Edmonson would be responsible for that restaurant. (Id. at 97:12–98:16). While in Paducah, Newell believed Edmonson completed his onboarding paperwork. (Id. at 106:18–25). Others support Newell's version of events in Paducah on July 12, 2022. (Id. at 113:15–18).

Mathis confirmed that she met with Edmonson on July 12, 2022, in Paducah. (Doc. No. 90, Trial Tr. Vol. II at 69:6–9), (Mathis). As the area director for restaurants assigned to Edmonson, Mathis was responsible for converting SPFS facilities into Captain D's facilities. (Id. at 64:6–13). She spent July 10, 11, and 12 in Paducah, Kentucky. (Id. at 64:4–17). With her was Madison Smith, who was also an area director. (Id. at 63:25–64:1). Mathis says she was never in Murray, Kentucky, on those days, but believed that Dawn Juenger, another area manager was assigned to Murray. (Id. at 64:18–65:10). Mathis and Smith onboarded new Captain D's employees in Paducah by completing their I-9 and payment forms. (Id. at 67:20–68:4).

On July 12, while in Paducah, Mathis met Edmonson for the first time and onboarded him as a new Captain D's employee. (Id. at 69:8–24). During the onboarding process, she sent him an email to reset his password as he requested. (Id. at 70:2–8; Def. Ex. 4; Joint Ex. 22). According to Mathis, Edmonson completed his onboarding that day in Paducah because she was able to

5

complete his I-9 form. (Id. at 72:9–25). As part of the I-9 verification process, she confirmed his identification with his driver's license and Social Security card. (Id. at 73:1–8). She did so because she understood that it is a legal requirement to check an employee's Social Security card as part of the I-9 process. (Id. at 73:4–8). She did not actually see him complete the onboarding documents. (Id. at 82:24–83:1). Mathis admits that she has no personal knowledge that Edmonson actually signed the EDR document. (Id. at 83:25–84:2). She also concedes, as Newell testified, that Edmonson had some trouble with his password and his email address, while completing the onboarding process. (Id. at 83:11–18). She saw Edmonson leave Paducah around 1:30 on July 12th. (Id. at 79:6–19).

Newell's and Mathis' testimony on what happened in Paducah on July 12, 2022, was also confirmed by Madison Leigh Smith. As an Area Director for Captain D's, she was working with Erin Mathis in Paducah on July 10, 11 and 12. (Doc. No. 92, Trial Tr. Vol. I at 117:23–24; 118:18–119:8), (Smith). They rode together to Paducah in the same car, stayed at the same hotel there and assisted each other to convert SPFS restaurants to Captain D's restaurants. (Id. at 119:5–121:15). On July 11 and 12, she and Mathis onboarded approximately 12-14 new Captain D's employees in Paducah. (Id. at 121:16–21).

On the morning of July 12, Smith recalls that around 9:30 a.m. she saw Newell and Edmonson arrive at the Paducah restaurant in separate cars. (Id. at 122:3–10). She assisted with onboarding two new employees that morning, one of which was Edmonson. (Id. at 122:11–15). She checked the PeopleMatter system, and it showed that Edmonson had not completed his onboarding paperwork. (Id. at 124:9–22). As a result, the PeopleMatter system would not allow her to complete Edmonson's onboarding. (Id.). Edmonson was told to complete the required onboarding paperwork. (Id. at 124:23–125:2). She "assumed" that Edmonson did so, because the PeopleMatter system "eventually" allowed her and Mathis to complete their part of Edmonson's

6

onboarding process. (Id. at 125:3–6). She did not have "any issues making sure Mr. Edmonson was onboarded that day." (Id. at 126:11–13). She assumes that Edmonson presented two forms of identification, one of which would be his Social Security card, but she did not actually see either. (Id. at 128:9–16).

The last witness at trial, called as an adverse witness by Captain D's, was Edmonson. His testimony was in sharp contrast to Captain D's other witnesses.

As a former SPFS employee, Edmonson applied to Captain D's for employment on Monday, July 11, 2022. (Doc. No. 90, Trial Tr. Vol. II at 87; Def. Ex. 2). As part of the application process he consented to receive, review and sign documents electronically (Joint Ex. 2); he agreed to the PeopleMatter Terms and Conditions; and he submitted his application for employment using his email address as timedmonson@spfs.net. (Joint Ex.17.) Edmonson completed the application process in Murray, Kentucky, on July 11 with Newell. (Id. at 92:3–9). He was assisted that day by a lady he thought was Erin Mathis but it was not her and may have been Dawn Juenger. (Id. at 93:18–94:8).

On Tuesday, July 12, 2022, Edmonson received an email from Captain D's (Def.'s Ex. 3) making a "conditional offer of employment to work as a General Manager at KY – Murray (3869) starting on July 11, 2022." (Id.). This email also contained a computer link "to complete required paperwork and tasks that must be done for your first day of work." (Id.). It instructed Edmonson to: "Just log-in with your username and password and you'll be on your way." (Id.; Doc. No. 90, Trial Tr. Vol. II at 98:3–10), (Edmonson). If he had any questions, he was instructed to call Jen Dismukes. (Id. at 99:7–9).

Edmonson followed Captain D's instructions, so when he had trouble logging in, he called Dismukes. (Id. at 99:10–22). On July 11 and 12, he called Dismukes three times during his onboarding process. (Id.). He first talked to her on Monday, July 11, using Dawn Juenger's phone,

7

who would not onboard him without a Social Security card. (Id. at 99:10–102:2). The second communication with Dismukes was on Tuesday, July 12 by "message or text or something" when he "told her this link's not working." (Id. at 99:10–22). On Tuesday morning, he received an email link from Dawn Juenger, but the link did not work so he called Dismukes again. (Id.). At this point, Edmonson says that he had two email links to complete his onboarding, but neither worked. (Id. at 100:13–101:1). According to Edmonson, Dismukes told him that she would work on it. (Id. at 99:10–22). The third and final communication between Edmonson and Dismukes on July 12 occurred "between 4 and 5 p.m. I don't know if I called her or she called me at the restaurant. But I spoke to her. And she said, It's taken care of. Don't worry about it; it's taken care of." (Id.).

Edmonson testified that he was in Murray, Kentucky, all day on July 12, so he believes that others are not being truthful when they testified he was in Paducah. (Id. at 102:14–23; 106:4–107:2). Edmonson explained that July 12 was a Tuesday and he does not work on Tuesday because his wife typically has multiple medical appointments that he must attend with her. (Id. at 128:11–20). He also offered pictures of him in the Walmart Store in Murray, Kentucky around 3:01 p.m. on July 12. (Id. at 132:21–133:20; Pl.'s Ex. 3). He captured pictures of Clausen pickles that his wife likes as an ongoing joke between them. (Id.). And as for July 11, Edmonson offered pictures of the traffic on the interstate when he was returning home that afternoon that he sent to his wife around 5:36 p.m. to explain to her why he would be late arriving at home. (Id. at 130:21–131:20; Pl.'s Ex. 8). Because he was in traffic at that time, he could not have signed onboarding documents close to the same time. (Id. at 130:21–132:9).

Edmonson also testified about the inconsistent username and email addresses attributed to him. He provided his email address on his employment application as timedmonson@spfs. (Joint Ex. 12). He points out that he did not have a Captain D's address – "tim_edmonson@CaptainDs"

8

on July 12. (Doc. No. 90, Trial Tr. Vol. II at 130:2–4). Further, he notes that the email Tim_Edmonson@spfs.net is not his correct SPFS email. (Id. at 129:7–24; Joint Ex. 4). And he denies ever using "Trdmonson" as his username, (id. at 129:4–6), so he questions the use of that username on Captain D's documents. See Joint Exs. 6, 7, 8, 9, 10, 11, 12, 13, and 14). According to Edmonson, Dawn Juenger told him that his Captain D's username was "TEdmonson." (Id. at 108:1–18). Edmonson received two computer links to access onboarding documents, one from Dismukes and another from Mathis, but neither worked. (Id. at 128:21–25). As a result, he never completed the 19 onboarding documents, (id, at 112:25–113:5; 120:22–23), including the EDR Agreement. (Id. at 120:24–121:13). He explained that his multiple attempts to complete the onboarding process using the "TEdmonson" username failed because the computer links sent to him did not work properly. (Id. at 108:1–18). He does admit that he "tried three or four times that day [July 12] to log in and access and do any paperwork and it would let me." (Id. at 111:18–23). Regarding the PeopleMatter system audit trail, Edmonson acknowledges what that document shows, but denies that he completed any of the onboarding documents. (Id. at 112:18–113:5; 120:22–23; 123:4–7). This includes the EDR Agreement. (Id. at 135:1–3).

Analysis

The evidence presented at trial required the jury to determine how much weight to give to each piece of evidence, and the credibility of each witness and then decide whether Captain D's carried its burden of proof. This Court is mindful that its review of the evidence must avoid weighing the evidence and the credibility of the witness to usurp the jury's fact-finding role, Holmes, 78 F.2d at 1047 (citing Lind v. Schenley Indus. Inc., 278 F.2d 79, 90 (3d Cir.) (en banc), cert. denied, 364 U.S. 835 (1960), and "a judge's nullification of the jury verdict. . . ." Vander Zee v. Karabatsos, 589 F.2d 723, 729 (D.C. Cir. 1978). The Court has considered all of the evidence presented at trial being respectful of its role and the jury's role. This Court concludes that a

9

reasonable juror could have found that Captain D's failed to carry its burden of proof that Edmonson accepted the EDR Agreement.

Beginning with the witnesses who allegedly had direct evidence regarding whether Edmonson signed all onboarding documents, including the EDR Agreement, Edmonson says he did not and Newell, Mathis and Smith testified that they have no personal knowledge that he did. (See Doc. No. 92, Trial Tr. Vol. I at 112:23–113:8, (Newell); 125:3–6; 128:4–8, (Smith); Doc. No. 90 Trial Tr. Vol. II at 83:25–84:2, (Mathis); 112:25–113:5; 120:22–23, (Edmonson). There is other evidence that supports Edmonson. There is the hotly contested factual dispute about whether Edmonson was in Paducah on July 12 or not, and if he was, whether he did in fact complete the onboarding documents on that date in Paducah. Edmonson plausibly testified that he was not in Paducah on Tuesday (due to his wife's need for medical treatment on Tuesday) and provided pictures of him in Murray that day. (Doc. No. 90 Trial Tr. Vol. II at 128:11–19; 132:21–133:20; Pl.'s Ex. 3). If the jury believed Edmonson, then who completed his onboarding materials that day as reflected in the PeopleMatter system audit trail? (Joint Ex. 24, People Matter Excel Spreadsheet).

Next, there is the hotly contested factual dispute about how and when Edmonson accessed the onboarding documents. Edmonson explained his three calls to Dismukes on July 11 and 12 when he reported to her that the two computer links he was sent to access the onboarding documents did not work. (Doc. No. 90, Trial Tr. Vol. I at 100:13–101:1, Edmonson). This makes sense because Dismukes was the person Captain D's instructed him to contact if he had any problems with accessing the onboarding documents. (Id. at 99:10–22; Def.'s Ex. 4). According to Edmonson, when he talked to Dismukes twice on July 12 she said, "It's taken care of. Don't worry about it; its taken care of." (Doc. No. 90, Trial Tr. Vol. II at 99:10–22). And Dismukes did not rebut these statements because she says after she hit the "hire" button on July 11, she did

10

nothing to onboard Edmonson as a new employee. (Doc. No. 92, Trial Tr. Vol. I at 164:9–13;179:8–9).

Contrary to Captain D's trial theory, the forty-four-page PeopleMatter Excel Spreadsheet ("Excel Spreadsheet" or audit trail), (Joint Ex. 24), was not a silver bullet. This is because it does not fit neatly with the other trial evidence. Captain D's relies, almost exclusively, on the first five pages of the audit trail to show that on July 12, 2022, Edmonson completed all onboarding documents. (Joint Ex. 24 at 1–5). Indeed, the Excel Spreadsheet shows that at 5:16 p.m. (UTC) four documents were completed—Company Policy, Uniform & Dress Code (English and Spanish), EDR Plan and Agreement (English and Spanish) and Contingent Letter. (Joint Ex. 24 at 4–5.) Each of the four documents appear to be associated with the "Trdmonson" username. (Joint Ex. 24 at 33). However, Edmonson testified that Captain D's assigned him the username "Tedmonson," and he never used the "Trdmonson" username. (Doc. No. 90, Trial Tr. Vol. II at 129:4–6). Interestingly, in August 2022 when Edmonson complained about having problems accessing the PeopleMatter system his username was changed to "Tedmonson." (Joint Ex. 22). Edmonson also stated under oath that he did not sign any documents and Newell, Mathis and Smith admitted they had no personal knowledge that he in fact did so. (See Doc. No. 92, Trial Tr. Vol. I at 112:23–113:8, (Newell); 125:3–6; 128:4–8, (Smith); Doc. No. 90 Trial Tr. Vol. II at 83:25–84:2, (Mathis); 120:22–23, (Edmonson). The evidence that Edmonson had trouble accessing the onboarding documents was not rebutted by Dismukes, the Captain D's point person on questions concerning the onboarding process. (Def.s Ex. 3). What's more, the jury had to resolve whether Edmonson signed the onboarding documents in Paducah as Captain D's contends, even though Edmonson testified, with support, why he was not in Paducah that day.

Captain D's repeated citation of Mitchell v. Cambridge Franchise Holdings, LLC., 433 F. Supp. 3d 1064 (W.D. Ky. 2020) for the proposition that an employee's sworn testimony that she

11

did not sign the arbitration agreement is legally insufficient to avoid a motion to compel is to no avail. (Doc. No. 97 at 11,14, 16–19; Doc. No. 99 at 2). Here, the Court is reviewing a jury's verdict, not deciding a motion to compel. This is a legally important difference. At trial, the jury determines the credibility of the witnesses, not so on a motion to compel. In any case, since Mitchell, the Sixth Circuit decided Bazemore v. Papa John's U.S.A., Inc., holding that a party's sworn denial regarding signing an arbitration agreement is indeed sufficient to deny a motion to compel. 74 F.4th 795, 798 (6th Cir. 2023). Based upon Bazemore this Court questions the holding in Mitchell, even if it was applicable here. (See also Doc. No. 32 (applying Bazemore to Captain D's motion to compel)).

The jury was presented with two versions of whether Edmonson signed the onboarding documents and specifically the EDR Agreement requiring arbitration of employment disputes. The parties do not challenge any evidentiary rulings during trial, do not raise any legal errors, and do not challenge the jury instructions. Captain D's argues solely that the jury verdict is against the clear weight of the trial evidence. The Court believes the parties presented their best case. The jury then did its job to weigh that evidence, the credibility of witnesses, and exhibits to decide whether Captain D's carried its burden of proof. While the Court expresses no opinion about whether the jury's verdict was correct or not, the Court can conclude, based on the entire trial record, that the jury's verdict that Captain D's did not prove by a preponderance of the evidence that Edmonson accepted the EDR Agreement was reasonable. As such, the Court is required to deny Captain D's motion for a new trial.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE