# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| TIM EDMONSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 3:23-cv-1065 |
| | ) |
| CAPTAIN D'S, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Tim Edmonson is suing his former employer, Captain D's LLC, for violating the Americans with Disabilities Act ("ADA"). (Doc. No. 1). He claims Captain D's violated the ADA in three ways. First, it failed to make reasonable accommodations for his bad back. (Id.). Second, it retaliated against him for asking for accommodations for his bad back. (Id.). Third, it discriminated against him by discharging him after learning about his bad back. (Id.). Captain D's moves for summary judgment, arguing that: (1) Mr. Edmonson never requested an accommodation for his back; (2) Mr. Edmonson cannot show that Captain D's retaliated because of any statutorily protected activity; and (3) Mr. Edmonson was fired for a legitimate, non-discriminatory reason, namely that he was not overseeing the requisite number of restaurants to be an Area Director for Captain D's. (Doc. No. 116). Mr. Edmonson opposes summary judgment, asserting that: (1) he made requests for accommodation at a meeting with Captain D's executives on August 25, 2022 and also submitted a "light duty" form from his doctor on August 29, 2022; (2) those requests for accommodation were protected activity and he was retaliated against for making them; and (3) Captain D's alleged business reason for firing him was pretextual because it replaced him with a non-disabled person and it allowed another non-disabled person to manage only three stores. (Doc. No. 121).

Now that the matter has been fully briefed, including the parties' statements of disputed and undisputed facts (Doc. Nos. 117, 122, and 128), and upon consideration of the parties' arguments and the evidence submitted, the Court will deny Captain D's summary judgment motion as to Mr. Edmonson's ADA discrimination and retaliation claims. However, the Court will grant Captain D's summary judgment as to the failure-to-accommodate claim.

I. UNDISPUTED FACTS

Between November 1991 and July 2022, Mr. Edmonson was employed by SPFS Inc.—a Captain D's franchisee—and over the course of those three decades he was given progressive amounts of responsibility. (Doc. No. 128 ¶¶ 2-3). In July 2022, Captain D's acquired SPFS Inc.'s eighteen restaurants and began managing them directly. (Doc. No. 122 ¶ 3). As part of the acquisition, Captain D's required SPFS employees to apply for their former positions. (Id. ¶ 4). In his application to Captain D's, Mr. Edmonson represented he was available to work 50 hours per week and could frequently stand, walk, reach above his shoulders, bend, lift, and/or carry up to 25 pounds. (Id. ¶ 8). Captain D's hired Mr. Edmonson as an Area Director—an equivalent position to the one he had with SPFS. (Id. ¶ 7). At SPFS, Mr. Edmonson oversaw three restaurants in Kentucky, and he continued to do so for Captain D's. (Id.).

Shortly after the Captain D's takeover, Mr. Edmonson met with Andy Castle, Captain D's Chief Operating Officer ("COO"), and Nan Ward, Captain D's Chief People Development Officer, on August 25, 2022. At this meeting—which was originally convened so that Mr. Castle could follow-up on Mr. Edmonson's inquiry about a severance package—Mr. Edmonson informed Mr. Castle and Ms. Ward of back pain he had been experiencing. (Id. ¶¶ 12-13; see also Doc. No. 118-9 at 2:1-5). Mr. Edmonson surreptitiously recorded this meeting, (Doc. No. 124), and the audio

2

recording has been professionally transcribed.[1] (Doc. No. 118-9). No one has objected to the Court considering the audio recording, so the Court will summarize only the most relevant parts of this twenty-one-minute conversation.

Mr. Castle began the August 25th meeting by telling Mr. Edmonson, "We just honestly want to talk to you about a comment that was made last night when you asked Ireland about severance." (Id.). Mr. Edmonson responded, "Well, the reason I'm asking is because my physical health has been bad since 2012. My back is busted up." (Id. at 2:6-8). He also informed Mr. Castle and Ms. Ward that he "went Monday to the doctor to do an MRI just to see what's wrong." (Id. at 2:17-18). Mr. Castle responded that "whenever we hear somebody's telling us they got a back injury or anything – anything medical whatsoever … we need to know from your doctor what limitations you may have." (Id. at 8:14-19); (see also id. at 9:16-17). He then reiterated that Captain D's "need[s] to know what [Mr. Edmonson is] physically capable of and not capable of." (Id. at 10:6-8). Ms. Ward also interjected and explained to Mr. Edmonson the process for either getting cleared for unrestricted work, requesting reasonable accommodations, or taking long-term disability:

> So what they'll do is they'll take your job description. They'll hear that I have to drive from X – I have to drive from this point to this point every day. I need to be here. I have to be active in these restaurants. And then they'll decide whether or not [to] restrict – your job descriptions . . . whether or not you are physically able to hit all those things. And then they'll do what they call a fitness to return to work. So it's like, here's what your limitations are. You bring those to us and we can say, hey, we can accommodate this, we can't accommodate that … [a]nd then at that point in time, if we can't accommodate, then you go on a medical leave of absence. Your short-term disability … kicks in, you have PTO. You can use your PTO. And then your long-term disability kicks in at 60 percent.

(Id. at 11:14-12:13).

---

[1] The Court listened to the entire audio recording and compared it with the transcript provided at Doc. No. 118-9. The transcript is an accurate representation of the conversation between Mr. Edmonson, Mr. Castle, and Ms. Ward on August 25, 2022.

3

Mr. Edmonson agreed to visit his doctor(s) and to provide any information and documentation he received to Captain D's. (E.g. id. 10:23-11:3, 11:5-8, 11:10-13, 21:18, 21:25, 22:5). He also noted:[2]

> I mean, I – you know, if I take another store and it's five, six hours from home … And I was worried about that [] because of my wife's situation … If I could run three stores for the rest of my life, I'll be happy. And I can run the hell out of them. But I can't do a bunch – six to ten stores and be gone all the time. I just can't do it.[3]

(Id. 12:23–13:15). Mr. Castle confirmed, "That's not part of the plan." (Id. 13:16-17). After that, the conversation focused primarily on Captain D's performance expectations and discussions about staffing issues in the restaurants overseen by Mr. Edmonson—not about Mr. Edmonson's health. (Id. at 15-28).

In addition to informing Mr. Castle and Ms. Ward about his back pain on August 25th, Mr. Edmonson also informed his immediate supervisor, Ronnie Newell. (Doc. No. 128 ¶¶ 10, 12). Mr. Edmonson also submitted a "light duty" form from his health provider to Ms. Ward on August 29, 2022. (Doc. No. 123-9, 123-10). The form said that Mr. Edmonson could return to work on August 24th but was limited to "light duty only." (Doc. 123-10). Captain D's accommodated Mr. Edmonson's request for "temporary light duty" while he waited for further medical evaluation. (Doc. No. 128 ¶ 18). Except for missing two days of work, Mr. Edmonson performed his essential job duties at his three assigned restaurants between August and November 2022. (Id. ¶ 36).

---

[2] At his deposition for this case, Mr. Edmonson admitted that he did not ask Mr. Castle or Ms. Ward for any specific accommodations during the August 25th meeting, (Doc. No. 123-1 at 81:11-13, 82:7–83:5), and that he could perform his role without any accommodations. (Id. at 86:10-16).

[3] Earlier in the conversation, Mr. Edmonson disclosed issues about his wife's health and noted that he could not travel far away from home because of her health. (Doc. No. 118-9 at 5:2-15).

4

On October 20, 2022, Sean MacMillan, Captain D's new Vice President of Human Resources, emailed Mr. Edmonson asking if he could provide "an updated physical capacity form." (Doc. No. 123-14 at 2). Mr. Edmonson responded:

> They haven't given me any new forms about limitation. They (the rehab place) has presented me with a rehab plan and schedule and reviewed my scan. My doctor appt is next week with my family doctor. I want to discuss the plan with him. Nothing has changed except the pain is much better than originally and seems to be progressively better than before. I do have several spots pushing into my spinal cord from the back of my spine … I start home traction tonight with a thing that I have to wear to treat the space and relieve pressure at night. Here is a pic of my neck scan. I will know more next week. The CT was Friday.

(Id. at 1). Mr. MacMillion replied:

> Thanks Tim. So I'm clear, you currently have no restrictions we need to accommodate? I want to make sure [we] are doing what we can to help you through this process.

(Id.). Mr. Edmonson responded:

> Right now I'm working and the pain is manageable. My personal doctor has referred me to a spine surgeon. I have been assigned on in Paducah but am looking at others right now. I will keep you posted.

(Id.).

On November 2, 2022, Captain D's fired Mr. Edmonson. (Doc. No. 122 ¶ 26). During his period of employment with Captain D's and SPFS, Mr. Edmonson never had a documented disciplinary issue or complaint regarding his performance. (Doc. No. 128 ¶ 1). Captain D's said Mr. Edmonson's position was eliminated because he was only overseeing three stores and that area directors needed to oversee five or more store. (Id. ¶ 28). Two months later, Captain D's also fired Jen Daley, an area director who was also overseeing only three restaurants. (Doc. No. 122 ¶¶ 26, 28). Madison Smith, an existing area director who was already overseeing five restaurants and was non-disabled, absorbed all of Mr. Edmonson's work duties. (Id. ¶ 29).

## II. LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## III. ANALYSIS

### a. ADA Discrimination

Captain D's moves for summary judgment on Mr. Edmonson's ADA and Tennessee Disability Act ("TDA") discrimination claims, arguing that it has offered a legitimate, non-discriminatory reason for firing Mr. Edmonson—*i.e.*, he was not managing the requisite number

6

of stores to be an Area Director.[4] (Doc. No. 126 at 16-20). Because Mr. Edmonson has produced some evidence suggesting this non-discriminatory reason is pretext—namely, that Captain D's allowed another Area Director to manage only three restaurants—his discrimination claim can make it to a jury.

Mr. Edmonson does not identify any direct evidence of discrimination; therefore, the Court must analyze his ADA discrimination claim using the same McDonnell Douglas burden shifting framework it utilized when considering his retaliation claim. See A.C. v. Shelby Cnty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013). To set forth a *prima facie* case of ADA (and TDA) discrimination, a plaintiff must show: (1) he has a disability; (2) he is otherwise qualified for the job; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) his position remained open or he was replaced. See Hrdlicka v. Gen. Motors, LLC, 63 F.4th 555, 566 (6th Cir. 2023); Williams v. AT&T Mobility Servs. LLC, 847 F.3d 384, 391 (6th Cir. 2017). The fifth element "may also be satisfied by showing that similarly situated non-protected employees were treated more fairly." Jones v. Potter, 488 F.3d 397, 404 (6th Cir. 2007).

"Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for its actions." Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1105 (6th Cir. 2008). The Defendant's burden "is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." Upshaw v. Ford Motor Co., 576 F.3d 576, 585 (6th Cir. 2009). "If the defendant can

---

[4] The ADA and TDA "generally prohibit the same sorts of discriminatory acts," and therefore, they are "analyzed utilizing the same standards." Garrett v. CSX Transportation, Inc., 321 F. Supp. 3d 812, 819 (M.D. Tenn. 2018) (citing Cardenas–Meade v. Pfizer, Inc., 510 F. App'x 367, 369 n. 3 (6th Cir. 2013)). Thus, the resolution of the ADA and TDA claims will be the same.

7

satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination." Talley, 542 F.3d at 1105. "To establish pretext, the employee must show 'that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.'" Hrdlicka, 63 F.4th at 569 (quoting Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 285 (6th Cir. 2012)).

For the purposes of summary judgment, Captain D's concedes that Mr. Edmonson can establish the first four elements of the *prima facie* case. (Doc. No. 116 at 16). Therefore, the Court must first consider whether Captain D's: (1) sought to replace Mr. Edmonson, or (2) whether it treated a similarly situated, non-disabled person more favorably than Mr. Edmonson.

Mr. Edmonson cannot show that Captain D's sought to replace him because his role was completely subsumed by another existing Area Director, Madison Smith. (Doc. No. 122 ¶ 29). However, Mr. Edmonson can offer some evidence that Captain D's treated similarly situated, non-disabled people more favorably than him.

For example, Mr. Edmonson has presented evidence that Madison Smith—a non-disabled person—was given the opportunity to manage eight stores and that the same opportunity was not extended to him. Given Mr. Edmonson's long tenure overseeing Captain D's franchised restaurants, it is doubtful that many employees would have more experience than him. He can certainly argue that given his long tenure in the restaurant business, he should have been offered more restaurants to oversee before being terminated. In other words, he should have been offered a choice. The fact that a non-disabled person was offered more restaurants and Mr. Edmonson was simply terminated could lead a reasonable jury to believe that Mr. Edmonson was treated differently because of his disability.

8

Second, Mr. Edmonson has also produced evidence that Jamie Doyle, another Area Director, was allowed to oversee only three stores and was only terminated for misconduct.[5] Captain D's now asserts that Jamie Doyle is not a true comparator because he oversaw five restaurants, not three. (Doc. No. 127 at 8). But this is a disputed fact. Captain D's own executives previously testified that Jamie Doyle oversaw only three restaurants. (Doc. No. 123-2 at 133:7-8) (Ms. Ward: "Jamie Doyle I believe had three restaurants at the time of acquisition."); (Doc. No. 123-4 at 89:18-24) ("Q: Jamie Doyle . . . How many stores did he oversee? Mr. Castle: Three restaurants."). If Captain D's has record evidence that Mr. Doyle oversaw more than three restaurants, it can present that evidence to the jury, but Mr. Edmonson is allowed to ask the jury to disbelieve Captain D's evidence based on the contradictory deposition testimony of its own senior executives.

Because Mr. Edmonson can offer some evidence that similarly situated, non-disabled people were treated more favorably than he was, he can satisfy the fifth element of a *prima facie* ADA discrimination claim. Moreover, given the nature of Captain D's legitimate, non-discriminatory reason—*i.e.*, that it only retained Area Directors who oversaw five or more stores—Mr. Edmonson can establish pretext through evidence that shows this rule was applied inconsistently amongst abled and disabled people. The evidence about Mr. Doyle, especially, allows Mr. Edmonson to clear the pretext hurdle and survive summary judgment on his discrimination claim.

b. **ADA Retaliation**

Captain D's also seeks summary judgment on Mr. Edmonson's retaliation claim. (Doc. No. 116 at 22-24). Captain D's argues that: (1) Mr. Edmonson never engaged in protected activity

---

[5] At his deposition, Mr. MacMillan testified that Mr. Doyle was fired for violating Captain D's cash handling policy in the "fall of 2023." (Doc. No. 123-3 at 139).

9

under the ADA; (2) Captain D's did not know that Mr. Edmonson had engaged in protected activity; and (3) there is no causal connection between Mr. Edmonson's discharge and any protected activity. (Id.). The only hotly disputed issue is whether there is a causal connection here.

The ADA provides: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Like with a discrimination claim, the McDonnell Douglas burden shifting framework applies to ADA retaliation claims. 411 U.S. 792 (1973). Therefore, to prove a *prima facie* case of retaliation, a plaintiff must show: "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." Gray v. State Farm Mut. Auto. Ins. Co., 2025 WL 2092378, at *3 (6th Cir. July 25, 2025); see also Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014). If Mr. Edmonson can establish a *prima facie* case of retaliation, the burden shifts to Captain D's to articulate a non-discriminatory reason for the adverse action. Id. If Captain D's articulates a non-retaliatory reason, the burden shifts back to Mr. Edmonson to show the non-discriminatory reason is pretext for discrimination. Id. The Court will begin, as it must, with whether Mr. Edmonson can establish a *prima facie* case of retaliation.

Mr. Edmonson easily satisfies the first three elements of the *prima facie* case. First, Mr. Edmonson's August 29th request to perform "light duty," (Doc. No. 123-10), constitutes protected activity. E.g., King v. Town of Wallkill, 302 F. Supp. 2d 279, 293 (S.D.N.Y. 2004) (a light duty request is protected activity under the ADA); DuHoux v. Am. Concrete Concepts, Inc., 2023 WL 6186897, at *6 (E.D. Tenn. Jan. 25, 2023) (same). Second, Ms. Ward—Captain D's Chief People

10

Development Officer—received Mr. Edmonson's request. (Doc. No. 123-9; see also Doc. No. 128 ¶ 18). This satisfies the employer knowledge requirement. Third, there is no dispute that Mr. Edmonson was terminated. (Doc. No. 128 ¶¶ 24-25). The only question is whether a reasonable jury could find a causal connection based on the 64 days between Mr. Edmonson's discharge on November 2 and his August 29th request for "light duty."

Mr. Edmonson relies exclusively on temporal proximity to connect his discharge to his request for "light duty." (Doc. No. 121 at 20-21). The Sixth Circuit has held that temporal proximity, standing alone, generally does not establish causation.[6] See Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008) ("[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."). There are exceptions to this rule, however, when "the adverse employment action occurs "very close in time after an employer learns of a protected activity."[7] Seeger v. Cincinnati

---

[6] See also Kenney v. Aspen Techs., Inc., 965 F.3d 443, 449 (6th Cir. 2020) (holding that a "roughly 75-day delay between [the plaintiff's] protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation and, therefore, that the plaintiff needed "to provide other indicia to support a causal connection") Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 321 (6th Cir. 2007) (holding temporal proximity alone is not enough; however, temporal proximity of three months plus a threat from a supervisor shortly after the protected activity took place is sufficient to satisfy causation element); Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 737 (6th Cir. 2006) (similar).

[7] E.g., Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 506 (6th Cir. 2014) (firing occurred one day after protected activity); Howington v. Quality Rest. Concepts, LLC, 298 F. App'x 436, 446–47 (6th Cir. 2008) (adverse action occurred two days after the employer learned of protected activity); McNett v. Hardin Cmty. Fed. Credit Union, 118 F. App'x. 960, 965 (6th Cir. 2004) (finding causation when "only 13 days" separated protected activity from adverse action, reasoning that an "employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation where the particular circumstances strengthen the inference of causation"); DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004) (twenty-one day lapse between protected activity and adverse employer action fell within close temporal proximity).

11

Bell Tel. Co., LLC, 681 F.3d 274, 284 (6th Cir. 2012) (quoting Mickey, 516 F.3d 516, 525 (6th Cir. 2008)). Although there are no bright-lines regarding timing, cases "indicate that the line should be drawn" somewhere around the ten-week mark."[8] Stein v. Atlas Indus., Inc., 730 F. App'x 313, 319 (6th Cir. 2018); see also Wyatt v. Nissan N. Am., Inc., 999 F.3d 400, 427 (6th Cir. 2021) (finding a "one-to two-month time lapse between the protected activities and the adverse actions suffices to establish a genuine issue as to causation.").

After considering the admittedly inconsistent Sixth Circuit authority on temporal proximity, the 64-day gap between Mr. Edmonson's August 29th "light duty" request and his termination just sneaks in just under the wire. Accordingly, his ADA retaliation claim survives summary judgment because: (1) Mr. Edmonson can rely on temporal proximity alone to establish causation; (2) causation is the only disputed element of the *prima facie* at this stage; and (3) as discussed above, Mr. Edmonson can produce some evidence establishing pretext that would allow a reasonable jury to conclude he was discharged because of his bad back rather than Captain D's legitimate, non-discriminatory reason.

c. **ADA Failure to Accommodate**

In addition to his discrimination and retaliation claims, Mr. Edmonson claims he sought accommodations, and those requests were denied in violation of the ADA. The ADA precludes employers from failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can

---

[8] The Sixth Circuit has inconsistently applied the "very close in time" exception to the general rule that temporal proximity alone is insufficient to establish causation. For example, in Kenney, 965 F.3d at 449, the Sixth Circuit held that a 72-day gap was insufficient to establish causation; however, in Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004), the Sixth Circuit held that a three-month gap was sufficient to show a causal connection based on temporal proximity alone.

demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." Brumley v. United Parcel Serv., Inc., 909 F.3d 834, 839 (6th Cir. 2018) (quoting 42 U.S.C. § 12112(b)(5)(A)). Failure-to-accommodate claims must be proven by direct evidence. See Blanchet v. Charter Commc'ns, LLC, 27 F.4th 1221, 1227 (6th Cir. 2022); see also Withers v. Nashville Historic Cemetery Ass'n, LLC, 729 F. Supp. 3d 802, 814 (M.D. Tenn. 2024).

A plaintiff who requires an accommodation bears the burden of proposing an accommodation and showing that it "seems reasonable on its face." Blanchet, 27 F.4th at 1229. Thus, to establish a *prima facie* case for failure to accommodate, a plaintiff must show that "(1) he is disabled under the ADA; (2) he is otherwise qualified for the position, with or without a reasonable accommodation; (3) his employer knew or had reason to know of his disability; (4) he requested a reasonable accommodation; and (5) the employer failed to provide the reasonable accommodation." Aldini v. Kroger Co. of Mich., 628 F. App'x 347, 350 (6th Cir. 2015). Here, Mr. Edmonson claims to have proposed accommodations on two occasions: (1) at the August 25th meeting with Mr. Castle and Ms. Ward; and (2) by providing his "light duty" note from his healthcare provider to Ms. Ward on August 29th. The Court will address each in turn.

### i. August 25th Meeting

The Court has listened to the audio recording of the August 25th meeting, reviewed the transcript, and considered the parties' arguments, and concludes that no reasonable jury could find that Mr. Edmonson requested accommodations during the August 25th meeting.

While a person with a disability "need not use the magic words 'accommodation' or even 'disability' [] to be entitled to consideration of the requested accommodation," Fisher v. Nissan N. Am., Inc., 951 F.3d 409, 419 (6th Cir. 2020), he must take some initiative to seek a reasonable

13

accommodation. It must be "clear from the context that [the request] is being made in order to conform with *existing* medical restrictions." Leeds v. Potter, 249 F. App'x 442, 449–50 (6th Cir. 2007) (emphasis added). Formalism does not matter but an employer must "be fairly said to know of [] the [employee's] [] desire for an accommodation." Allen v. Middle Tennessee Sch. of Anesthesia, Inc., 2022 WL 10551094, at *7 (M.D. Tenn. Oct. 18, 2022); see also G.E. v. Williamson Cnty. Bd. of Educ., 731 F. Supp. 3d 954, 993 (M.D. Tenn. 2024).

During the twenty-one-minute conversation between Mr. Edmonson, Mr. Castle, and Ms. Ward, they covered many topics. These include Mr. Edmonson's "horrible" attitude, (Doc. No. 118-9 at 15:20-21); his unreachability by phone and email, (id. at 16:9-12); his desire to earn a certain amount of money, (id. at 3); his fear about having to oversee "six to ten stores" and work "50 to 55 hours" per week, (id.); the conduct of two managers who worked underneath him, (id. at 23-24); his resentment towards his former employer for "breaking promises," id. at 14-15; and his wife's health conditions, (id. at 2, 5 and 13). They also discussed Mr. Edmonson's bad back; however, Mr. Edmonson emphasized that he had no existing diagnosis and was waiting for further medical tests to ascertain the scope of his injury. (Id. at 9:1-8; 10:23-11:8) ("They don't really know – they took an X-ray of my neck to send to the insurance to get approved for the MRI. But they didn't really diagnose anything."). At points during the conversation, he also downplayed the seriousness of his condition. (Id. at 10:12-14) ("[I]f I take muscle relaxers, I can do anything,"); (id. at 12:14-15) ("[M]aybe it won't be that bad,"); (id. 13:11-13) ("[I]f I could run three stores for the rest of my life, I'll be happy. And I can run the hell out of them."); and (id. at 27:17-18) ("I've work[ed] with my back hurt for several years."). Nonetheless, Mr. Castle and Ms. Ward encouraged Mr. Edmonson to pursue medical treatment, obtain a diagnosis, and let them know of

14

any requested accommodations. Id. at 8:15-19, 9:13-20, 10:6-8, 10:18-21, 11:14– 12:13, 21:12– 22:16, 25:11–26:21, and 27:3-24.

Mr. Edmonson believes that mentioning his upcoming medical appointments was a request for accommodation under the ADA. (Doc. No. 121 at 14-18). It was not. Throughout the twenty-one-minute conversation, Mr. Castle and Ms. Ward explained the accommodation process to Mr. Edmonson and told him they would consider any reasonable accommodations that a medical professional said were necessary. (Doc. No. 118-9) ("We still care about you. So follow through with your doctor. Find out from your doctor about what he feels or she feels would be reasonable limitations or otherwise. And we will look at that as quickly as you can get it to us. The sooner the better."). No one would have left the August 25th meeting thinking that an accommodation had been requested because at that point there was no existing diagnosis establishing a disability or the scope of that disability. Rather, it is clear from the entirety of the conversation that Mr. Castle and Ms. Ward gave Mr. Edmonson marching orders: (1) get diagnosed; (2) inform his doctor about his work duties, and (3) discuss any physical limitations that may need to be accommodated in the future based on the diagnosis. From the conversation, it is obvious that Mr. Castle and Ms. Ward supported Mr. Edmonson pursuing a diagnosis, getting necessary treatment, and requesting reasonable accommodations. There is simply no evidence that Captain D's ever discouraged Mr. Edmonson from making or attending medical appointments. Therefore, even if mentioning upcoming medical appointments was a request for accommodation, Mr. Edmonson has offered no evidence that Captain D's denied that request—a fact that is also fatal.

During the August 25th conversation, Mr. Edmonson also mentioned concerns about managing more than three stores. He now claims (with the assistance of counsel) that those stray comments were requests for an accommodation. Again, they were not. While the standard of

15

review requires consideration of the evidence in the light most favorable to Mr. Edmonson, the comments must also be considered in context. Mr. Edmonson's concerns about managing more than three stores were clearly based on his wife's poor health and his need to be her caregiver. (Id. at 5:11-15 and 12:24–13:9) ("How can I be four, five, six hours from home in the store when she's calling me saying, I'm in an adrenal crisis … I mean, if I take another store and it's five, six hours from home … I was worried about that too because of my wife's situation."). Mr. Edmonson never said, "I'm not physically capable of managing more than three stores," or "I'm not able to drive to certain stores because of my bad back." He only said he did not want to be too far away from home in case his wife needed him. (Id.). Considering the nature and context of his comments, Mr. Edmonson did not make a request for accommodation based on his existing disability when he expressed concern about managing more stores. It is too late for Mr. Edmonson to plead a Family Medical Leave Act ("FMLA") claim, which would appear to more naturally fit the facts of this case. Regardless, attempting to do so would prove futile, at least in the context of a failure-to-accommodate theory, because the FMLA does not contain a failure-to-accommodate provision like the ADA. See Tillotson v. Manitowoc Co., Inc., 727 F. App'x 164, 170 (6th Cir. 2018) ("[T]he FMLA does not appear to have a freestanding reasonable-accommodations provision," and "the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodations obligations of employers covered under the [ADA].").

In sum, no reasonable juror could find that Mr. Edmonson's comments during the August 25th meeting "fairly" informed Captain D's about "[a] desire for an accommodation." Allen, 2022 WL 10551094, at *7. This is confirmed by Mr. Edmonson's deposition testimony where he concedes he did not ask Mr. Castle or Ms. Ward for any specific accommodations during the August 25th meeting. (Doc. No. 123-1 at 81:11-13, 82:7–83:5). Therefore, Mr. Edmonson's

16

reasonable accommodation claim cannot survive summary judgment based on the August 25th meeting between him, Mr. Castle, and Ms. Ward.

### ii. August 29th Light Duty Form

On August 29, 2022, Mr. Edmonson provided Ms. Ward with a medical form stating he could only perform light duties. (See Doc. No. 123-10; see also Doc. No. 118-1 at 84-86). Despite Captain D's protestations otherwise, (see Doc. No. 116 at 8), this form was a request for accommodation. However, it is also undisputed that Captain D's accommodated Mr. Edmonson's request for "temporary light duty" while he waited for additional medical testing. (Doc. No. 128 ¶ 18). Therefore, Mr. Edmonson cannot establish a failure-to-accommodate claim based on the August 29th "return to work" form because Captain D's accommodated his "light duty" request. (Id.).

To the extent Mr. Edmonson argues his "discharge" was a constructive denial of his request for reasonable accommodation, that argument conflates a failure-to-accommodate claim with ADA discrimination/retaliation claims. Cf. Johnson v. Maryland Transit Administration, 2021 WL 809768, at *5 (D. Md. Mar. 2, 2021) (noting that plaintiffs cannot "double dip" by asserting failure-to-accommodate and discrimination claims based on the same employer action); McClain v. Tenax Corp., 304 F. Supp. 3d 1195, 1206 (S.D. Ala. 2018) (same). There is a difference between the denial of an accommodation and an actual or constructive discharge. See Velez-Ramirez v. Puerto Rico through Sec'y of Just., 827 F.3d 154, 158 (1st Cir. 2016). Because termination and denial of an accommodation are not synonymous, and because Mr. Edmonson has not introduced any evidence that Captain D's denied his request for "light duty," summary judgment must be granted to Captain D's on Mr. Edmonson's failure-to-accommodate claim.

17

## IV. CONCLUSION

Captain D's knew that Mr. Edmonson had complained about back pain when it terminated him in November 2022. Despite the bad optics, Captain D's justified this termination by claiming that Mr. Edmonson was not overseeing at least five restaurants, as required. However, there is at least some disputed evidence that Captain D's allowed a non-disabled person to manage less than five restaurants and only terminated him for cause. There is also evidence that Captain D's offered the opportunity to manage more restaurants to a non-disabled person, but not to Mr. Edmonson. Taken together and viewed in the light most favorable to Mr. Edmonson, as the non-moving party, a reasonable jury could decide that Captain D's actually discriminated against Mr. Edmonson and that it retaliated against him for engaging in protected activity.

Mr. Edmonson cannot, however, reach a jury on his failure-to-accommodate claim. Mr. Edmonson never requested an accommodation that Captain D's denied—a dispositive fact.

For these reasons, Captain D's is entitled to summary judgment on Mr. Edmonson's failure-to-accommodate claim. All other claims will proceed to trial.

An appropriate order will issue.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE